### BRICE L. REZEAU v. THE STATE.

No. 6808. Decided June 29, 1923.

Rehearing denied October 10, 1923.

**1.—Manslaughter—False Imprisonment—Charge of Court—Self-Defense—Arrest.**

Where the theory of the State rested upon the hypothesis that appellant had, in some sense, falsely imprisoned the deceased, who in an effort to free himself reduced appellant to the extremity of killing deceased to save his own life, and defendant claimed self-defense, and the court attempted to define an arrest and instructed the jury that if deceased was arrested by appellant the same was unlawful, and attempted to tell the jury that if appellant had arrested deceased and later shot him in order to save his own life he would be guilty of manslaughter, the same is reversible error under the facts in the instant case.

**2.—Same—False Imprisonment—Rule Stated.**

One detained by means not reasonably calculated to detain, and who does not even resort to ordinary means for relieving himself, is not falsely imprisoned, and neither he nor the State could so claim under any rule of reason or statute.

**3.—Same—Self-Defense—Charge of Court—Rule Stated.**

A party may have a perfect right of self-defense, though he may not be entirely free from blame and wrong in the transaction. If the blamable or wrongful act was not intended to produce the occasion, nor an act which was, under the circumstances reasonably calculated to produce the occasion or provoke the difficulty, then the right of self-defense would be complete,

though the act be not blameless. Following Mason v. State, 228 S. W. Rep., 954.

### 4.—Same—Rehearing—Arrest—Charge of Court—Imperfect Self-Defense.

In the judgment of the majority of the court the charge of the trial court on the subject of arrest was unduly restrictive against the appellant. There may have been no arrest in a legal sense, however, and still there may have been facts which would modify the right of perfect self-defense. However, the application of the statute defining the offense of false imprisonment was inapplicable to the case.

### 5.—Same—Evidence—Deserter—Motive—Army Regulations.

The army regulations to which the adjutant would have testified would seem not to be sufficient to warrant the arrest of the deceased by the defendant, and was, therefore, not competent. However, testimony that deceased was an enlisted soldier in the United States army and that he was absent without leave was admissible in evidence as bearing on the motive of deceased to free himself.

Appeal from the District Court of Dallam.  Tried below before the Honorable Reese Tatum.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Tatum & Strong,* and *Chas. L. Black,* for appellant.  On question of arrest and false imprisonment, Williams v. State, 53 Texas Crim. Rep., 2; Martin v. State, 57 id., 266; Snider v. State, 155 S. W. Rep., 533.

On question of unnecessary force, Miller v. State, 21 S. W. Rep., 925; Ex parte Sherwood, 29 Texas Crim. App., 334; Turner v. State, 16 id., 390; Condron v. State, 155 S. W. Rep., 253.

On question of perfect right of self-defense, Hason v. State, 228 S. W. Rep., 954; Young v. State, 53 Texas Crim. Rep., 415.

On question of rejecting testimony on desertion, Burkhardt v. State, 202 S. W. Rep., 513.

On question of trespass and self-defense, Nix v. State, 45 Texas Crim. Rep., 504; Mitchell v. State, 50 id., 181; Harrelson v. State, 60 id., 539.

*R. G. Storey,* Assistant Attorney General, for the State.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Dallam County of manslaughter, and his punishment fixed at confinement in the penitentiary for a period of two years.

The facts will sufficiently appear in the discussion of the various propositions involved in this opinion.  The theory of the State in this prosecution rests upon the hypothesis that appellant had in some

sense falsely imprisoned the deceased who, in an effort to free himself therefrom, reduced appellant to the extremity of taking the life of deceased in order to save his own; that appellant being himself the original wrongdoer and having brought about the occasion or necessity for taking life, would be deprived of his right of self-defense and in any event would be guilty of manslaughter, of which offense he stands convicted. The case is without precedent in this State, as far as we can ascertain. The facts are almost without dispute. Appellant was in the employe of the Rock Island Railway Company and had an office in the yards of said company at Dalhart. He was called a patrolman and his duties required him to look after the property of the company and of its patrons in the yards and cars of said company and protect name from trespassers and depredations. Appellant said it was his custom when he met strangers in the yards whom he knew to be not working therein, to ask them in a respectful manner their mission and business there. This would seem reasonable. On the morning of April 5, 1921, at about 7 o'clock appellant was on his way through said yards to his office. He met two men who were strangers and asked them where they were going. One said he was going across to take a road into Oklahoma looking for work, and named the town to which he was going. This man then walked on off. The other man, who was the deceased, volunteered a story about having been held up at the point of a gun in El Paso by a man dressed in soldier clothes, who compelled him to exchange his civilian clothes for the military attire of the man with the gun. Appellant made some observation that the man must have been about the same size as deceased, or that the clothes fitted all the way round. No answer was made to this observation and appellant asked deceased if he would go with him to his office, that he was interested in his story and would like to talk it over with him. Appellant started and deceased walked along with him voluntarily. When the two men arrived at the office, which seems to have consisted of a derailed car, appellant unlocked the door and both men went in. The door was left open. A conversation as to the identity of deceased then followed during which he produced some papers and showed them to appellant. After looking at the papers and talking further with deceased, appellant suggested that his story sounded funny and asked deceased if he would wire his people and get them to wire some identification of him. This deceased declined to do. Appellant then asked permission to wire El Paso to see if he could find out who deceased was. To this deceased made no reply. Appellant was sitting at a table and drew toward him a pad of paper and began to write what purported to be a telegram addressed to the Commanding Officer of the 82nd Field Artillery, of El Paso, Texas. Deceased was standing near by. Appellant wrote the following:

"Man giving name as Albert L. Baker, in jail here has Navy discharge and in full soldiers uniform, collar insignets 'F' Battery Vanerial Prophylasis form 77, name as A. Brown, 'F' Battery Weight about 120 L. B. hair for light brown hair," and was at this juncture struck on the back of the head by a pistol in the hands of deceased. For a few seconds appellant was stunned but recovering jumped to his feet and the two men grappled. After struggling for a moment or two deceased got loose and grabbed his pistol, which had fallen on the table when he struck appellant. Upon this, appellant threw his arms around the arms and body of deceased but the latter twisted around in appellant's embrace and put the muzzle of his pistol in appellant's face. The latter knocked it up at the instant it was fired by deceased. Deceased then broke away from appellant who drew his own pistol and fired it past deceased, commanding him to stick 'em up or he would hurt him. Instead of sticking up his hands deceased raised his pistol apparently to shoot again. It was aimed at appellant's chest. As deceased got his gun up this time appellant shot him through the body and deceased dropped his pistol, sank to the floor and some days later died from the effects of this wound. Appellant at once gave the alarm and persons who went to the scene of the shooting described the condition and surroundings. Appellant was bloody and had two pistols in his hand and a wound on the back of his head at a point where he might easily be killed by a blow, as testified by a doctor. Before his death deceased made various statements about the affair, all in substantial accord. One of said statements was given in testimony by Dr. Dawson as follows:

"I had three conversations with that boy, the one in which he gave me his name was the day afterwards, one of the nurses was waiting on him and was present during the conversation, her name was Mrs. Hogan. This conversation I had took place the next day after he was brought to the sanitarium, in which he told me he was 20 years old, and his name was Albert Lee Stout. In this conversation he repeated the fact that it was his fault he was shot, he also said that he had the pistol in his puttee, and he also stated that when the officer was seated at his desk he reached down and got his gun and struck the officer over the head, and the gun bounced out of his hand, and that he and the officer scuffled for it, but he got it and fired, but didn't try to kill him. I also asked him if he was shot from the front or back, and he said 'From the front, right here,' putting his hand over the wound."

A nurse, Mrs. Hogan, testified as follows:

"The conversation I refer to in which he said his name was Albert Lee Stout, and also said his name was Albert Baker, that was when he was talking to Dr. Dawson in my presence. In that conversation

he stated he had the pistol in his puttee, he also stated it was his fault that he got shot. He also stated that when the officer was seated at his desk he reached down and got his gun and struck the officer over the head and the gun bounced out of his hand, and he and the officer scuffled for it, that he got it and fired it, but did not try to kill him. He also stated he was shot in front.''

Dr. Campbell, another attending physician, testified as follows:

''With reference to how the difficulty came up, the boy stated to me, that the officer had searched him and was writing out a telegram, and that he felt that if that telegram went thru he would be detained and sent back to the Fort, and his first thought was to knock out the officer, he did not want to hurt him, he thought he would stun him and while his back was to him he struck him over the head with his gun and he said the officer, in the place of being °stunned, grabbed him and caught him and hung to him and in the scuffle he lost his gun. Later he got possession of his gun and fired at the officer, and then he stated that the officer fired at him and said when the officer went to reach for his gun to fire at him he tore loose from him, wheeled off just a short distance and the officer shot him he reckoned, but missed him, or he thought he missed him. He stated then that he tore down on the officer and shot again but his gun had failed him, misfired, and before he could shoot again or take another aim the officer shot him. He said his legs gave way and he just settled down. As to his position, he described it as being half and half, that was his statement.'·

In submitting the case to the jury the trial court defined an arrest in paragraph 9 of the charge as follows:

''An arrest is where a party has been actually placed under restraint or taken into custody by a party against his will.''

He also gave paragraph 10 as follows:

''You are charged that if you find and believe from the evidence, beyond a reasonable doubt, that the defendant arrested Alfred Stout, as that term is used in paragraph nine of this charge, that said arrest, (if any) was unlawful.''

Upon the proposition that appellant acted in self-defense, the court only gave the following:

''Now, bearing in mind the foregoing definition of 'murder' and 'manslaughter' as defined in this charge, unless you find and believe from the evidence, beyond a reasonable doubt, that the defendant had arrested and was restraining the said Alfred Stout at the time of the homicide, and you find and believe from the evidence that said Alfred Stout was making an unlawful attack upon the defendant, which from the manner and character of said attack, (if any) the defendant believed that he was in danger of being killed or receiving serious bodily injury, and so believing he shot

and killed the said Alfred Stout, you will acquit the defendant, or if you have a reasonable doubt as to these facts you will give the defendant the benefit of the doubt and acquit him.''

No other charge applying the law of self-defense appears in the record. The court also charged the jury as follows.

''XIII. You are charged that if you find and believe from the evidence, beyond a reasonable doubt, that the defendant arrested and restrained the said Alfred Stout, and you further find and believe from the evidence, that the defendant shot the said Alfred Stout in order to protect himself from being killed or receiving serious bodily harm from the said Alfred Stout, and you do not find and believe from the evidence, beyond a reasonable doubt, that at the time the defendant arrested and restrained the said Alfred Stout that he had the intention to kill or do great bodily harm to the said Alfred Stout, in case the said Alfred Stout tried to make his escape or release, you can not find the defendant guilty of a higher grade than manslaughter.

XIII½. You are charged that a party may use such force as necessary to resist an unlawful arrest, and when an unlawful arrest is made it is sufficient to produce provocation if the party arrested knew the same to be unlawful, and in this connection you are charged that before the deceased would have had the right to resist said arrest, if you find that there was an unlawful arrest, you must further find and believe from the evidence that the said deceased knew that said arrest was unlawful.''

It is thus made to appear that the court attempted to define an arrest in paragraph 9, and stated to the jury in paragraph 10 that if deceased was arrested by appellant, same was unlawful, and in paragraphs 13 and 13½ attempted to tell the jury that if appellant had arrested deceased and later shot him in order to save his own life, he would be guilty of manslaughter, and in effect, that if appellant was restraining deceased, that the latter would have the right to use whatever force was necssary to free himself.

These charges were excepted to and the charge as a whole was also complained against for its failure to submit the law of self-defense and the right of appellant to detain for a reasonable time one whom he might deem a trespasser upon the company's property, and special charges presenting affirmatively various theories of the defense were asked and refused.

We think the learned trial judge in error in defining an arrest and in giving those charges wherein the theory of an arrest was presented. As we read this record there was no proof warranting such charges or showing an arrest of deceased by appellant, nor that deceased believed himself under arrest at any time. An examination of the statement of facts discloses without dispute that

appellant asked deceased when they first met if he would go to the office in the yards, and that deceased voluntarily assented and went. Such request was not unreasonable on the part of the care-taker of premises who finds one thereon whose story excites suspicion. A farmer who finds a stranger in his orchard, a dairyman who finds one in his lot, or a householder who finds one on his premises, and from the acts and conduct of the stranger has his suspicion aroused and asks such person if he will go to his house, can hardly be held in any sense to have arrested such person if the latter agrees to the request and voluntarily goes. It further appears that when the office of appellant was reached and entered he sat down and then questioned and talked to deceased. No threat was made, no violence was used, no command was given, and no restraining word was uttered. The door was open all the time. It further appears that after some talk and deceased was asked if he would wire to his people, that his declination so to so was considered by appellant as a suspicious circumstance. The fact that appellant asked deceased to so wire violated neither the letter nor the spirit of any law. The deceased was wholly within his rights in declining to do this. No arrest or illegal restraint yet appears. Appellant then drew toward him a pad of paper and wrote thereon the purported telegram. He avers that his purpose in writing this was to test deceased and if the latter had not objected to the sending of such telegram, appellant said this would have ended the matter. If he did object, appellant said he would then have called the sheriff to come and take charge of deceased. He had not finished the writing when he was struck by deceased on the head. It is not even shown that deceased was aware of the fact that in the purported telegram appellant had written the statement that he was in jail. Cross-examined as to his purpose in writing this appellant swore that he had no other purpose than to investigate, and that had deceased gotten up and walked out of the office he would have let him ·go, but would have notified the sheriff and put him in possession of the facts. This was the condition and situation when deceased struck appellant on the head with the pistol and the struggle began, which ended in the fatal shooting.

We must not lose sight of the fact that deceased was not on trial and that his attitude and conduct become material only as they affect the legality of the acts of appellant. Why did deceased strike appellant? Why did he struggle with him and finally try to shoot him and thus bring about the apparent necessity on the part of appellant to himself shoot deceased in order to protect his own life? If the answers shed light on the acts of appellant they are material.

We can not presume against one on trial in a criminal case, nor impute a guilty construction or inference to the facts, when a con-

struction or inference compatible with innocence arises therefrom
with equal force and fairness.

With reference to what caused the trouble as viewed from the
standpoint of the deceased, we find in the statement made by him to
Dr. Campbell above quoted this: "That the officer (appellant) had
searched him and was writing out a telegram, and that he felt that
if the telegram went thru he would be detained and sent back to the
Fort, and his first thought was to knock out the officer . . . and
while his back was to him he struck him over the head with his gun."
It thus appears that deceased did not strike to free himself from
present restraint and that such conclusion would be an inference
without support in the declarations or statement of deceased, but
on the contrary that he did strike to avoid the consequences of which
would result from the sending of the telegram.   The adjutant of
the regiment stationed at Fort Bliss, near El Paso, Texas, to which
deceased belonged, was brought before the court as a defense witness
but not allowed to testify.   From his offered testimony as set out in
a bill of exceptions it appears that on April 3rd, two days before
the instant killing at Dalhart, Texas, deceased was A. W. O. L.
from his regiment at Fort Bliss, many miles distant from Dalhart.
Conscious of this situation and fearful of arrest as a deserter if the
telegram was sent, and giving full weight to the testimony of each
party to this tragedy,—the strongest inference arising from the
assault on appellant by deceased is that thereby the latter sought
relief from future detection and detention and not from present
restraint.   If from the standpoint of deceased there arose no belief
or fair inference of restraint, and none appears from an examina-
tion of the acts and conduct of appellant, then instructions to the
jury predicated on the theory of illegal arrest and the right of de-
ceased to use force to free himself therefrom, were subject to ex-
ception and were hurtful to appellant and should not have been
given.

Our statute forbids false imprisonment, Chapter 5, Title 15, Ver-
non's P. C., but in order for the detention of another to amount to
a violation of such statutes it is expressly stated that it must be
wilful and against the consent of such other, and must in any event
be some conduct which prevents such other person from "removing
from one place to another as he may see proper."   See Art. 1039 of
said Chapter.   In order to be wilful, the detention must be with
evil intent, legal malice, or without ground for believing the de-
tention to be legal, as was held by this court in Smyth v. State,
51 Texas Crim. Rep. 415.   Again in Art. 1041 of said Chapter it is
provided that the "impediment" must be such as in its nature is
calculated to detain the person, and from which he can not by
ordinary means relieve himself.   This is not only the mandate of

statutory utterance but it is just. One detained by means not reasonably calculated to detain and who does not even resort to ordinary means for relieving himself, is not falsely imprisoned, and neither he nor the State could so claim under any rule of reason or statute. Again Art. 1043 of said Chapter provides that the detention of a person for one of the objects mentioned in Article 1014 of our Penal Code is not an offense. Construing this in connection with subdivision 4 of Art. 1014 P. C., it is clear that one may be reasonably detained for the purpose of preventing or interrupting an intrusion upon the lawful possession of property; and as applied to the instant case it may be said that appellant as the servant of a corporation owning the railroad yards and cars and having the care of the property therein, would be guilty of no offense if he detained trespassers and intruders upon said property no further than was reasonably necessary to ascertain the purpose of their presence and to prevent depredation on such property of which he was in a sense a care-taker. Furthermore, if while he so detained such person, he using no force, threats or violence, such person so detained without making any ordinary effort to release himself from such detention, should make an assault upon the caretaker which from its nature and character was reasonably calculated to inflict death or serious bodily injury, and in defending against which death or serious bodily injury be inflicted, we think a perfect right of self-defense would exist and should be submitted to the jury upon a trial. From what has been said it follows that we are of opinion that it was error to give paragraphs 9, 10, 13, 13½, 14 and that part of paragraph 16 of the charge of the trial court in which appellant's right of self-defense was abridged by reason of an arrest of the deceased. In our opinion upon another trial the proposition of arrest should be omitted from the charge as not finding support in the testimony.

We think error also appears in the rejection of the testimony of Adjutant Breckinridge who identified deceased and offered to testify that he was absent without leave from his regiment on April 3rd and up to the time of the homicide. Such evidence shed light on the attitude of the deceased and his action in making the attack upon appellant which led to the killing. We think it no error to allow in evidence the clothes worn by deceased which might shed light upon the disputed proposition as to the position of the parties at the time of the homicide, the State's contention being that deceased was shot in the back, and that of the defense that he was facing appellant at the time the fatal shot was fired.

Special charge No. 10 to the effect that there could be no presumption as to the custody and restraint indulged against appellant but that same must be proven and that appellant must have actually placed deceased under restraint or taken him in custody against

his will, before the jury would be warranted in concluding that there was any illegal restraint, would seem to present a correct proposition of law.

As applicable, we further observe that one detained by another who uses no force, threats or violence, may not himself use more force to obtain relief from such detention than is reasonably necessary to effect that object, and if he does so use unnecessary force he becomes himself the wrongdoer, and a perfect right of self-defense might arise on behalf of the party so detaining. As is said in Mason v. State, 88 Texas Crim. Rep., 642, 228 S. W. Rep., 954; discussing the rights of one who may have done things thought to have provoked a difficulty, which is a kindred question to that here involved:

"A party may have a perfect right of self-defense though he may not be entirely free from blame and wrong in the transaction. If the blamable or wrongful act was not intended to produce the occasion, nor an act which was, under the circumstances, reasonably calculated to produce the occasion or provoke the difficulty, then the right of self-defense would be complete, though the act be not blameless."

A principle analogous to the one under discussion was involved in Hardin v. State, 49 S. W. Rep. 607, wherein the rights of one to resist the use of unnecessary force on the part of an officer in arresting him, was under discussion and we said:

"If deceased was attempting an arrest of defendant in a lawful manner,—that is, without the use of more force than was reasonably necessary for that purpose,—and appellant resisted the arrest, drew a pistol to prevent being arrested, and fired at the officer, then he could not set up self-defense. Tiner v. State, 44 Tex. 128. If, on the other hand, appellant did not resist the officer, but was merely attempting to escape or evade an arrest, then the officer had no right to kill him; and if, under such circumstances, deceased first drew his pistol, and shot at appellant to kill him to prevent his escape, the officer had no right to do this; and in such case appellant's right of self-defense would be perfect."

In the instant case it should be stated in the charge that even though appellant was detaining deceased, if the latter made no effort to obtain relief by ordinary means and did not deem himself in danger from any violence or force on the part of the appellant, and in such situation attacked the latter by an assault of sufficient gravity to cause reasonable apprehension of death or serious bodily injury, that the right of self-defense on the part of appellant would be perfect.

For the errors mentioned, the judgment of the trial court will be reversed and the cause remanded.

*Reversed and remanded.*

(Delivered June 29, 1923).

MORROW, Presiding Judge (concurring).—On the facts stated in the opinion prepared by our associate, Judge Lattimore, I concur in the reversal of the judgment. I am not able, however, to adopt all of the reasons that are given in the original opinion as a basis for that result. In my judgment, the charge of the court on the subject of arrest was unduly restricted against the appellant. There may have been no arrest in a legal sense, however, and still there may have been facts which would modify the right of perfect self-defense. I believe that upon another trial the case should be dealt with upon the principles of imperfect self-defense, the court adapting them in appropriate language to the facts in hand. I think that the application of the statute defining the offense of false imprisonment inapplicable to the case. It is not a question of putting the appellant in the attitude of committing that offense, but in determining what offense, if any, he committed in killing the deceased under the circumstances which the record reveals. I do not wish to be understood that the right of perfect self-defense should not be submitted but to convey the idea that the jury should be called upon to determine the evidence whether the law of perfect self-defense or imperfect self-defense should control.

If I properly comprehend the record, the testimony of the Adjutant of the regiment at Fort Bliss touching the circumstances under which a deserter from the United States Army may be arrested was not admissible, in evidence. It is conceived that the right to arrest in time of peace would depend upon the existence of some law authorizing the arrest under the immediate facts. If there be laws of the United States enacted by Congress which govern the right to arrest, of them judicial knowledge will be taken, but if there were no such law, then the Army regulations to which the Adjutant would have testified would seem not to be sufficient to warrant the arrest. In either event, the testimony, in the judgment of the writer, was not competent.

In concurring in the reversal, in view of another trial, it is deemed proper to make these remarks.

(Delivered June 29, 1923.)

HAWKINS, Judge.—As I understand the facts, I am in accord with the views expressed in the concurring opinion of Presiding Judge Morrow.

ON REHEARING.

October 10, 1923.

MORROW, Presiding Judge.—The expressions in the concurring opinions were not intended to convey the idea that it was not per-

missible for the officer of the United States army to testify that deceased was an enlisted soldier in the United States army and that he was absent without leave. The testimony to these facts was admissible.

The language in the concurring opinion was directed to the effort upon the part of the appellant, as shown by his Bill of Exceptions No. 4, to elicit the opinion of the witness touching the interpretation of army regulations or laws of Congress authorizing the arrest of deserters from the United States army.

The concurring opinion filed upon the original hearing is modified or supplemented by the statements herein contained, and the motion for rehearing is overruled.

*Overruled.*